## BLOOD vs. PALMER.

By written contract between A. and B. the former was to furnish the latter, from time to time, with goods to be sold for cash, lumber, country produce, &c. and not otherwise — said goods or the proceeds of them to be held by B. as the property of A. — the goods to be charged to B. on A's books, and all articles received in exchange, credited — the business to be transacted in the name of B. *Held*, that this could not be regarded as *a sale*, and the goods, or the proceeds of them, attachable by B's creditors.

The principle, that a delivery of goods to one to be returned *or* something else in their stead, at the option of the receiver, constitutes *a sale*, does not apply to factors and agents.

Under the foregoing contract, B. having appropriated a portion of the goods to his own use, gave A. a mortgage of his farm to secure the payment for them — and at the same time agreed *in writing to carry on and improve the farm*, he to receive a reasonable compensation for his services by deducting the amount from the debt due to A. — in which writing it was also stipulated that the produce of the farm should be the property of A. *Held*, that the produce was not liable to attachment at the suit of B's creditors, on the ground of fraud in the transaction.

REPLEVIN for hay, hogs, oars, &c. Plea, property in one *Oren Briggs*, and that they were attached on a writ, *O. Crosby & al.* against him. On trial, it appeared that the hogs and oars had been received by *Briggs* as the produce of a sale of goods which the plaintiff alleged were his, the said *Briggs* acting in said transaction, as agent, merely.

To maintain the action, the plaintiff introduced the following agreement, *viz :* "Memorandum of agreement made and concluded between *Blood & Wells* of *Bangor*, traders, on the one part, and *Oren Briggs* of *Blakesburg*, trader, of the other part. The said *Blood & Wells* agree to furnish from time to time, and in such quantities, as shall be thought expedient by said parties, goods to said *Oren Briggs*, for the purpose of vending to the best advantage in said town of *Blakesburg*. And the said *Briggs* agreed to sell the goods as aforesaid for cash, lumber, country produce, or any other articles of trade, on delivery of the goods, and in no other way, or hold them, or the proceeds realized from them in such articles as are enumerated above, as the property of said *Blood & Wells*, and subject to their order. And it is further agreed that the goods so furnished by said *Blood & Wells* shall be charged by them on their books to said *Oren Briggs*, and

whatever he shall pay from time to time, shall be placed to the credit of his account in their books. Also, that the business transacted as aforesaid by said *Briggs*, shall be done in the name of *Oren Briggs.* In witness whereof we have set our hands and seals this 28th of *November*, *A. D.* 1828.

*Horatio P. Blood*, [L.S.]

*Chas. B. Wells*, [L.S.]

*Oren Briggs*, [L.S.]"

*Blood & Wells* dissolved their copartnership, *September* 1st, 1830, when *Wells* assigned to the plaintiff all his interest in the partnership property.

*Oren Briggs*, on being called, testified that the swine and oars were the proceeds of goods delivered him by *Blood & Wells* under the foregoing agreement — that, the goods received by him of *Blood & Wells* were charged to him on their books, and that he was credited with the net proceeds of lumber, &c. delivered them. That, he kept no account with *Blood & Wells* — took whatever goods he wanted for his family, and made no charge to himself — that in all purchases where notes were given, he gave them in his own name — that he settled with *Blood & Palmer*, in 1829, for goods purchased under this contract, and gave them his note for $789,04 — the whole amount furnished having been $2411,48. That, there was no agreement for any compensation for his services — that his sign was *Oren Briggs, Agent* — and that he was reputed insolvent at that time, and that it was well known to his customers that he was the agent of *Blood & Wells*.

The defendant's counsel requested the Judge to instruct the jury that these facts constituted a sale of the goods, so far as third persons were concerned. But he instructed them, that the creditor on whose suit the chattels in question were taken, being such before these transactions, as far as he was concerned, they gave no false credit to *Briggs;* but that, they would consider how far the above facts were evidence of fraud and collusion between the plaintiff and *Briggs* in reference to his creditors generally.

The hay was claimed by the plaintiff, on the ground that, he owned the land upon which it was cut, and that it was cut by *Briggs* as his agent.

It appeared that on the 15th day of *May*, 1829, *Briggs* con-

veyed to *Blood & Wells* by deed of mortgage, a lot of land in said *Blakesburg*, containing fifty acres, the apparent consideration being $500, but said *Briggs* being in fact indebted to them at that time for goods taken for the use of his family and otherwise, in the sum of $350 only, though still holding their goods, which he continued from time to time to receive.

On the same day *Briggs* gave to *Blood & Wells* the following writing, *viz:* " Whereas, *I, Oren Briggs*, am indebted to " *Blood & Wells* of *Bangor*, in the sum of about $350, and " whereas the said *Blood & Wells* have this day given me per- " mission to occupy and improve a certain piece of land owned " by them in *Blakesburg*, be' g," &c. ; " now therefore, I, the " undersigned, do hereby agree in consideration of the premises " to occupy and improve said fifty acres *for them* and as their " agent, they paying and allowing to me a fair price for the labor " which I shall bestow upon said land out of the aforesaid amount— " due from me to them. The said *Blood & Wells* further agree " to allow to said *Briggs* out of said amount a fair market price, " for all seed which he may sow or plant on said fifty acres in " pursuance of this contract ; and reserve to themselves liberty " to end this contract at such time as they may think fit. It is " further understood and agreed by both parties that said *Briggs* " is to improve said land in the same manner, and is to have the " same claim and no greater to the produce raised thereon than " he would have if said *Blood & Wells* personally occupied said " land and hired said *Briggs* to work thereon by the day."

*Briggs* testified that, no particular time or price was agreed for his labor — that he had not charged his own labor, or what he had paid in hiring others — that the plaintiff credited him with the hay cut on said farm.

The counsel for the defendant contended that if *Blood & Wells* were the owners of the goods, and the proceeds of the goods, delivered *Briggs* under the contract, that the mortgage deed was *per se* fraudulent and void as to the creditors of *Briggs*. He further insisted, that the agreement of *Blood & Wells*, and the facts testified to by *Briggs* were a legal fraud. But the presiding Judge instructed the jury that these facts were evidence of fraud between *Blood & Wells* and *Briggs* in reference to his

creditors, which they would consider in connexion with other evidence in the case, all of which was not reported.

The hay grew on the lot aforesaid after the dissolution of co-partnership between *Blood & Wells*, and the Court ruled, that the contract of 28th of *Nov.* 1828, and the contract of 15th of *May*, 1832, had no continuing validity upon the subsequent occupancy.

The counsel for the defendant insisted that *Briggs* was tenant under *Blood*, and that the crops, attached as *Briggs'* property, were in fact his until delivered to *Blood*, which was not done here. Upon this point the presiding Judge instructed the jury, that, as it did not appear that either party had given notice to the other of any dissatisfaction as to the terms and conditions of the occupancy of *Briggs*, after the dissolution of the partnership between *Blood & Wells*, or that any change therein was claimed or expected by either side, they, the jury, might infer, that, it was understood and expected that *Briggs* would continue to occupy upon the same terms and conditions, as he did before the dissolution.

The jury returned their verdict for the plaintiff, upon which judgment was to be rendered, if the foregoing instructions were correct, otherwise it was to be set aside and a new trial granted.

*J. Appleton,* for the defendant, contended that the facts proved shew *a sale* of the goods — that the transaction contained all the elements of a sale. — But he dwelt more particularly on the circumstance that *Briggs* was to return the goods *or* something else. 14 *Johns.* 167 ; 3 *Mason,* 478 ; *Heard* v. *West,* 7 *Cowen,* 752.

As to the mortgage and contract of *Briggs* for the occupation of the farm, the counsel contended that, the goods were either sold or not : — if *sold,* then they were attachable ; if not sold, then the mortgage of the farm was purely a voluntary conveyance. It could not be regarded as a conveyance made as security for the faithfulness of *Briggs* as agent, because it does not so purport ; and a deed must speak for itself, — be construed by its own terms. The deed being void, the lease of course falls with it.

The mortgage and lease taken together shew a secret trust, and therefore the conveyance was void. 4 *Rand.* 282 ; *Howe* v. *Ward,* 4 *Greenl.* 206 ; *Coburn* v. *Pickering,* 3 *N. H.* 415.

The operation and effect of the lease or contract was, to keep the property locked up, away from the creditors of *Briggs* — it is therefore fraudulent and void.   The facts being proved, the question is one of law, whether they constitute fraud or not. *Jackson* v. *Mather*, 7 *Cowen*, 304 ; *Jennings* v. *Cater*, 2 *Wend.* 405 ; *Sherwood* v. *Merwick*, 5 *Greenl.* 302.

But if the contract was a valid one, it could subsist no longer than the continuance of the partnership.   As tenant at will, the hay belonged to *Briggs*, until a delivery to the plaintiff, and was attachable as his, *Briggs'* property.   *Butterfield* v. *Baker*, 5 *Pick.* 522 ; *Waite, appellant, &c.*, 7 *Pick.* 100 ; *Bailey* v. *Fillebrown*, 9 *Greenl.* 12.

*McGaw*, for the plaintiffs, cited 2 *Stark. Ev.* 615 ; *Howe* v. *Ward*, 4 *Greenl.* 195 ; *Reed* v. *Woodman*, 4 *Greenl.* 400 ; *Usher* v. *Hazeltine*, 5 *Greenl.* 471 ; *Brooks* v. *Powers*, 15 *Mass.* 247 ; *Badlam* v. *Tucker*, 1 *Pick.* 295 ; *Banorgee* v. *Hovey*, 5 *Mass.* 26.

WESTON J. — Had *Briggs* been the original owner of the goods he undertook to sell, and had they been purchased by the plaintiff and his partner and left with *Briggs* to be managed and sold by him, according to the written contract between the parties, the transaction would have afforded very strong evidence of a fraudulent sale.   But the goods were not originally his ; and the question is not whether there was a fraudulent sale or not, but whether there was any sale to *Briggs*.   It was for the plaintiff and his partner to determine, on what conditions they would part with their own goods ; and under what circumstances *Briggs* should be permitted to have possession of them.   And it was distinctly agreed, that they should continue the owners of them, and if sales were made on their account, which *Briggs* was authorized to do, of whatever was received in exchange.   The ownership of the goods and of their proceeds, in all their stages was to remain unchanged ; and he was permitted to sell only for ready pay.   He thus became their factor or agent ; and upon that condition he was suffered to receive the goods.   There is nothing fraudulent or collusive in this mode of doing business ; and it is of common occurrence.   He was, it appears, reputed

insolvent, and they could not with safety have transferred the property upon his credit. It was part of the agreement that he should be charged with the goods, and credited with what he remitted from time to time. In this mode, his fidelity as agent would be ascertained. It cannot be understood from the whole instrument, that he was charged with the goods as purchaser, but as bailee or agent ; for he was to receive and hold them in that capacity.

By the contract, the business was to be done in the name of *Briggs.* From his testimony it appears, that the word agent, was appended to his sign over his door ; and that it was well known to his customers that he was the agent of the plaintiff and his partner. He further testified, that there was no agreement for any compensation for his services. The Judge, who presided at the trial, was requested by the counsel for the defendant, to instruct the jury, that these facts constituted a sale of the goods, so far as third persons were concerned. The question whether there was fraud and collusion between the plaintiff and *Briggs,* of which these and other facts were relied on as evidence, was left to the jury ; but the Judge declined to instruct them, that these facts constituted a sale, or could be treated as such by the creditor represented by the defendant ; his debt having accrued prior to the receipt of the goods. And if the transaction was not tainted with fraud, which the jury have negatived, we are satisfied that they were upon this point properly directed. If the business had been conducted in the name of *Briggs,* as by the contract he was permitted to do, and his agency had not been known, the goods might have been held under these circumstances, to make good any false credit thus obtained.

It has been urged, that the facts being settled, whether fraud results, is a question of law. Without discussing the correctness of this position, it may be stated, that by the written contract there was no sale ; and whether there was, notwithstanding a sale, resulting from the dealings between the parties, which must be made out affirmatively, depended upon other evidence, the truth and bearing of which was properly left to the jury. Many of the cases, cited for the defendant, presented questions of fraudulent sale, sought to be defeated on that ground. Here an attempt is made to establish as a sale, what does not appear on the face of it, to have been so intended.

In *Marsh* v. *Wickham,* 14 *Johns.* 167, a sale of a quantity of leather was clearly made and intended, but qualified with the privilege of returning such portions of it, as might remain on hand at the time of settlement.

In *Hurd* v. *West,* 7 *Cowen,* 752, it is decided, that where the bailee contracts to return the property bailed, or deliver property of the same kind and quality, or to do the latter only, the letting is not properly a bailment, but operates as a sale, and the right of the bailor is a chose in action only. And this is in accordance with the opinion of *Sir William Jones.* *Jones on Bailments,* 2*d edition,* 102, who says "it may also be proper to mention the distinction between an obligation to restore the *specific* things, and a *power or necessity of returning others equal in value.* In the first case it is a regular bailment; in the second, it becomes a *debt.*" The receiver, having the option to return the identical goods, or others equivalent, those received become his own, to dispose of at pleasure, in the same manner as if he had borrowed a sum of money, promising to return the same amount. But *this* rule does not apply to factors and agents, who act throughout in behalf of their principals, although they fulfil their duty, if they pay over the price, for which they may have sold goods, instead of returning the goods themselves. The price received belongs to him who owned the goods. It could never be seriously pretended, that if one man employ another to exchange his horse for a yoke of oxen that, in the course of the business, either the one or the other would become the property of the agent. It is otherwise, if a party receives the horse of another, promising to return it, or a yoke of oxen. He receives in his own right, and not as agent. The remedy of the one, and the liability of the other, rests in contract. In the case before us, *Briggs* was to exchange the plaintiff's goods for cash, lumber, and country produce, and that there might be no question about the ownership, it was expressly agreed that the goods, while on hand, and whatever was received in exchange for them, should continue the property of the plaintiff.

It appears from the testimony of *Briggs,* that he took, for the use of his family, such of the goods as he thought proper; and becoming thereby, or in some other way, indebted to the plaintiff and *Wells,* his partner, in the sum of three hundred and fifty dol-

lars, and still holding their goods, which he continued from time to time to receive, he did on the 15th of *May*, 1829, mortgage to them fifty acres of land in *Blakesburg*, to secure five hundred dollars. This, together with the agreement made by *Briggs* with them, in relation to the occupancy of the same land, the counsel for the defendant insisted was fraudulent and void; and we must understand that the Judge was so requested to direct the jury; but he instructed them that the foregoing facts, with other testimony in the case, were evidence of fraud, all of which he submitted to their consideration. We perceive nothing necessarily fraudulent or unlawful in taking the mortgage. It might be wanted for the security of the plaintiff and *Wells*. *Briggs* was already their debtor for two thirds of the amount secured, and they had just reason to apprehend further delinquency. If the mortgage was lawful, they were entitled to the possession and profits; and the agreement for the employment of *Briggs* upon the land, for their benefit, was lawful, if unattended with fraud in fact, upon which the jury have passed. This agreement, which is in writing, and has the same date with the mortgage, is made by *Briggs*, with the plaintiff and *Wells*, his partner. It has no limitation as to time, but the case finds, that the Judge at the trial, was of opinion that it was vacated, by the dissolution of their partnership, in *September*, 1830. By the terms of that dissolution, the plaintiff became the assignee of all the debts due the firm, and of every description of partnership property whatever. Now we do not understand why the dissolution should vacate the contract with *Briggs*, in relation to this land, any more than any other contract made with the firm; and why it was not a subsisting and continuing contract, which might be enforced by the plaintiff, in the name of the firm; at least as long as *Briggs* occupied the land. Regarding the contract as subsisting to that extent, which is well warranted by the evidence, the produce of the farm belonged to the plaintiff, and the verdict upon this point is sustained. But independent of this ground, which is decisive, we think the jury might rightfully draw the inferences, submitted to them by the Judge. It does not appear that *Briggs* was tenant of the land by the plaintiff's consent, or that he was permitted to occupy it in any other capacity, than as a hired man.

*Judgment on the verdict.*